United States Bankruptcy Court

District of Massachusetts

|  |  |
|---|---|
| In re<br><br>MILLIVISION, INC.,<br><br>Debtor | Chapter 7<br>Case No. 03-47109 |

## MEMORANDUM OF DECISION

Before the Court is the "Objection of Jeffrey Alholm to Chapter 11 Trustee's Stated Amount to Cure" (the "Objection to Cure Amount"). This dispute arises following the sale of the assets of Millivision, Inc. (the "Debtor") by David W. Ostrander (the "Trustee"), as Chapter 11 trustee, now Chapter 7 trustee, of the Debtor.

The Debtor's assets included rights under a severance agreement between the Debtor and its former Chief Executive Officer, Jeffrey Alholm (the "Severance Agreement"). The Debtor's rights under the Severance Agreement, as well as under various executory contracts, were assumed and assigned to the buyer in connection with the sale, pursuant to 11 U.S.C. § 365. Payment of any amounts necessary to cure defaults under the assumed and assigned contracts remained the responsibility of the estate. The Trustee's positions with respect to any potential cure claims were noticed to the other parties to those contracts, and a deadline was set by which those parties could object. Specifically as to Alholm, the Debtor asserted that no amount was due " . . . because of [Alholm's] alleged breach [of the Severance Agreement]." Alholm saw it differently. He timely filed an

objection seeking payment in the amount of $181,224.00.[1]

Three (3) days of trial ensued. Based on the evidence submitted, this Court makes the findings of fact and conclusions of law set forth below, pursuant to Federal Rule of Bankruptcy Procedure 7052, as made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014.

I.    FACTS

The Debtor, a Massachusetts corporation, was engaged in the development of millimeter wave imaging technology. That technology is designed to identify potentially dangerous items on the body of a person, without the need for a physical search. Obviously, the technology may be of great value in these times.

The Debtor operated in some form since the year 2000. Alholm's involvement with the company began in late 2001, and, when the Debtor incorporated, Alholm became its President and Chief Executive Officer. He was hired by the board of directors to take the fledgling company to a new level, attract capital and promote and exploit its cutting edge technology. Unfortunately, Alholm soon found himself at odds with the board which had hired him. Whether or not well-founded, Alholm came to the conclusion that board members were dissipating the resources of the company for their personal gain. Alholm was not circumspect in his views. He shared his thoughts with others in the company and soon was perceived by the board as a threat to them and to the company's viability and

---

[1] Alholm also filed a proof of claim in the amount of $172,387.00. In his objection to the proposed cure, he noted the proof of claim and advised that "upon further mathematical calculation, the amount to cure pursuant to said Severance Agreement is $181,224.00 . . ." and reserved the right to amend the proof of claim accordingly. By the time Alholm filed his post-trial bench brief, his calculation had reached $202,288.26.

ability to attract venture capital.

On December 4, 2002, Alholm had a breakfast meeting with two of the members of the board of directors. They informed him that he would be terminated because of unapproved financial transactions and what the board felt was his disparagement of certain officers and board members. This disparagement allegedly consisted of, *inter alia*, Alholm's open questioning of certain business expenses charged by board members and disagreement over whether the business could support salaries and bonuses which the board contemplated for proposed new employees. The board members, rightly or wrongly, viewed Alholm's approach as a form of confrontation and they chose to terminate Alholm in response.

After some negotiation, the Debtor and Alholm settled upon the Severance Agreement, executed on December 23, 2002. The Severance Agreement provided that Alholm would be paid an annual salary of $200,000.00 and insurance benefits through June 30, 2003. Thereafter, Alholm would be entitled to salary and benefits until December 31, 2003 only if he could not locate comparable employment. Alholm would also receive a bonus of $140,000.00 for calendar year 2002, to be paid on January 2, 2003.[2] The Debtor would continue through January 30, 2003 to pay for rental housing occupied by Alholm and, by that date, Alholm would turn in the rental car provided to him by the Debtor. The Debtor would reimburse Alholm for any outstanding business expenses charged to his American Express card prior to the date of the Severance Agreement, and Alholm would return by January 2, 2003 all property of the Debtor in his possession, including, without limitation, computer equipment, software, keys and access cards, credit cards, files and

---

[2]Alholm testified that this amount was really deferred compensation. The Court need not address the distinction as the parties agree that the sum was paid.

any other documents. Alholm acknowledged that all previous confidentiality agreements remained in full force and agreed not to compete with the Debtor for a period of one year.

Pursuant to the Severance Agreement, Alholm and the Debtor each released all claims that they may have had against the other as of the date of the Severance Agreement (the "Mutual Release Clause"). They also agreed not to make disparaging statements concerning the other (or affiliates or current or former officers, directors, shareholders, employees or agents). Alholm and the Debtor agreed not to directly or indirectly take, support, encourage, or participate in any action or attempted action, except in response to a subpoena or court order, which would in any way damage the reputation or business relationships of the other, its agents or representatives. Alholm and the Debtor each warranted and represented that they had not already done so (jointly the "Non-Disparagement Clause"). Finally, the Severance Agreement provided that the Debtor had the right to terminate or suspend payments only if a court of competent jurisdiction first determined that Alholm failed to comply in a material respect with any of his obligations under the Severance Agreement (the "Payment Termination Clause").

Notwithstanding the effort that went into the Severance Agreement, the parties' relationship did not improve thereafter. The bi-weekly payments to be made by the Debtor to Alholm were delivered sporadically. All told, the Debtor only received seven (7) bi-weekly payments from January of 2003 through December of 2003, and his requests for payment of unreimbursed pre-Severance Agreement expenses were not heeded. On the other side, the Debtor was unsatisfied with Alholm's responses to the Debtor's requests for return of property owned by the Debtor, including furniture, files and computers. Further, the Debtor was unsatisfied with the quality of Alholm's efforts to seek new

4

employment. And, most important, the Debtor complained bitterly that Alholm had continued, post-Severance Agreement, to disparage the company and its principals. Indeed, the Debtor complained that Alholm not only encouraged and abetted a former employee to pursue a sexual harassment claim against one of the Debtor's principals, but also authored an unsigned letter (the "Anonymous Letter"), dated February 24, 2003, purportedly from "A Millivision Shareholder." That letter, which accused the Debtor's remaining principals of various financial and personal irregularities, was distributed to all of the Debtor's shareholders (including employee-shareholders), a representative of the United States government,[3] and the spouses of two officers of the Debtor.[4] Little, if any, progress was made by the parties toward resolution of these issues.

In December of 2003, an involuntary Chapter 7 bankruptcy petition was filed against the Debtor.[5] The Debtor first contested the involuntary petition, but ultimately consented to the case proceeding under Chapter 11. The Court ordered the appointment of a Chapter 11 trustee and, following the sale of the Debtor's assets, the case was converted to Chapter 7 and the Chapter 11 trustee appointed as the Chapter 7 trustee.

---

[3] The copy of the Anonymous Letter sent to the United States representative was sent with a cover which described the pending sexual harassment claim by a former employee and alleged a predatory sexual propensity of one of the Debtor's board members. The cover also described board members of the Debtor as "shady characters," one of whom was "closely aligned with Arab factions."

[4] The copies of the Anonymous Letter sent to the spouses were sent with a cover which described the pending sexual harassment claim by a former employee and alleged a predatory sexual propensity of one of the Debtor's board members (husband of one of the recipients).

[5] The involuntary petition was originally filed by four creditors: Geoff Roper, Kuhn Riddle Architects, Inc., ATB Service, Inc. and Richard Strong. These original petitioning creditors were later joined by Gravity Switch, Inc. and Alholm.

## II.  POSITIONS OF THE PARTIES

The Trustee maintains that Alholm is not entitled to any further severance payments because the Severance Agreement was based upon a false warranty by Alholm and because Alholm subsequently breached the Severance Agreement. The specific allegations made against Alholm are wide-ranging. First, the Trustee says that, despite the Non-Disparagement Clause, Alholm disparaged the officers and directors of the Debtor prior to the execution of the Severance Agreement. Second, the Trustee contends that Alholm violated the Non-Disparagement Clause by continuing to disparage officers and/or directors of the Debtor subsequent to his execution of the Severance Agreement. Notable amongst those alleged post-Severance Agreement disparagements was the Anonymous Letter. Third, the Trustee maintains that Alholm violated the Severance Agreement by failing to return approximately $15,000.00 of company property. Finally, the Trustee alleges that Alholm did not make a good faith effort to find comparable employment following his separation from the company.

Alholm, on the other hand, denies that he is in breach of the Severance Agreement. He says that, despite a flurry of allegations, the Trustee has provided no credible evidence of any breach by Alholm. Alholm argues that any pre-Severance Agreement disparagement is irrelevant because the Debtor was aware of the disparagement, and the Severance Agreement included the Mutual Release Clause by which the Debtor released him from all pre-Severance Agreement claims. Alholm contends it was the Debtor who was in breach of the Severance Agreement because the Debtor was contractually obligated (pursuant to the Payment Termination Clause) to continue payments until such

time as it received a court order allowing it to stop. Alholm further maintains that the Debtor breached the Severance Agreement by failing to make timely payments and reimburse him for expenses incurred on behalf of the company. Finally, Alholm alleges that he made diligent efforts to find comparable employment following his separation from the Debtor.

III. <u>DISCUSSION</u>

    A.  <u>*Burden of Proof*</u>

When an estate representative seeks to assume a contract pursuant to 11 U.S.C. § 365,[6] proof of the *amount* of any monetary default is the ultimate responsibility of the non-bankrupt party. <u>In re Rachels Industries, Inc.</u>, 109 B.R. 797, 802 (Bankr. W.D. Tenn. 1990). Any such dispute should be resolved by assigning those same burdens associated with the proof of any claim in a non-§ 365 context.[7]

---

    [6]11 U.S.C. § 365(b) provides in relevant part:
      (1)    If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee-
        (A) cures, or provides adequate assurance that the trustee will promptly cure such default . . .

    [7]11 U.S.C. § 502(a) provides in relevant part:
      A claim or interest, proof of which is filed under Section 501 of this title, is deemed allowed, unless a party in interest . . . objects.

    11 U.S.C. § 502(b) provides in relevant part:
      . . . (I)f such objection to a claim is made, the court, after notice and hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in lawful currency of the United States in such amount . . .

Once established, however, the burden of demonstrating that the default has been *cured* shifts to the estate representative. <u>In re Rachels Industries, Inc.</u>, 109 B.R. at 802;

It is well settled that if a party in interest objects to a bankruptcy claim, the objector bears the initial burden of production. See, e.g., Juniper Dev. Group, et al. v. Kahn (In re Hemingway Transport, Inc.), 993 F.2d 915, 925 (1st Cir. 1993); In re Allegheny International, Inc., 954 F.2d 167, 173-74 (3rd Cir. 1992); In re Beverages International Ltd., 50 B.R. 273, 280 (Bankr. D. Mass. 1985); In re WHET, Inc., 33 B.R. 424, 437 (Bankr. D. Mass. 1983). If that burden is met, the burden of persuasion shifts to the claimant as it would lie under non-bankruptcy law. Id. And, also consistent with non-bankruptcy law, a party who raises an affirmative defense (e.g., an offsetting claim, the failure to mitigate losses) bears the burden of demonstrating its existence. See, e.g., Cummings Properties, LLC v. Dwyer (In re Admetric Biochem, Inc.), 284 B.R. 1, 7 (Bankr. D. Mass. 2002); In re White, 168 B.R. 825, 829 (Bankr. D. Conn. 1994).

B. *Payment Termination Clause*

Alholm seeks to cut off this inquiry by reliance on the Payment Termination Clause. He argues that the Debtor had the right to terminate or suspend payments *only if* a court of competent jurisdiction first determined that Alholm failed to comply in a material manner. Alholm maintains that because the Debtor failed to bring its dispute with Alholm to a court of competent jurisdiction, it waived any defense to payment of the amounts due under the Severance Agreement. This Court disagrees.

The purpose of the Payment Termination Clause was to avoid the economic leverage that the Debtor would enjoy if it simply stopped making payments for no valid purpose and

---

Georgia Ports Authority v. Diamond Manufacturing, Co., Inc. (In re Diamond Manufacturing Co., Inc.), 164 B.R. 189, 199-200 (Bankr. S.D. Ga. 1994).

8

left Alholm with a law suit whose time of disposition would be unacceptably distant. Alholm negotiated for the inclusion of the Payment Termination Clause to avoid just such a result. He did not trust the Debtor's principals to treat him fairly. Accordingly, the Debtor was required under the terms of the Severance Agreement to obtain the approval of some court in order to stop the payment stream.

Perhaps the Payment Termination Clause would have worked. But Alholm never used it. The Debtor was in payment default under the Severance Agreement almost immediately after its execution. Alholm failed to seek any legal redress. He approached no court for any restraint against the Debtor. True, the Severance Agreement placed the burden of seeking court action on the Debtor, and any court could have sanctioned the Debtor for failing to take that action. But it is a far and unacceptable stretch to suggest that, because the Debtor failed to seek a court's pre-approval of its temporary suspension of payments to Alholm, the Trustee is now precluded from asserting a defense to liability under the contract as a whole. Rather than viewing the Debtor as having waived any defense to payment by failing to obtain a court approval, it is more consistent with the contract, Alholm's goals for the Payment Termination Clause and what transpired after execution of the agreement to conclude that it was Alholm who waived his rights by failing to act, including his rights, if any, to employ the Payment Termination Clause in the manner he originally intended.

Section 15(g) of the Severance Agreement provides:

> (g) In the event that any provision or portion of a provision of this Agreement shall be determined to be illegal, invalid or unenforceable, the remainder of this Agreement shall be enforced to the fullest extent possible and the illegal, invalid or unenforceable provision or portion of a provision will be amended by a court of competent jurisdiction to reflect the parties' intent

if possible. If such amendment is not possible, the illegal, invalid or unenforceable provision or portion of a provision will be severed from the remainder of the Agreement and the remainder of this Agreement shall be enforced to the fullest extent possible as if such illegal, invalid or unenforceable provision or portion of a provision was not included.

Section 15(e) of the Severance Agreement further provides:

> (e) In the event of any dispute, this Agreement will be construed as a whole, will be interpreted in accordance with its fair meaning, and will not be construed strictly for or against either [Alholm] or Millivision.

This Court views the Payment Termination Clause as now moot. It provided Alholm, at most, with a right to some form of equitable relief against the Debtor. But Alholm having failed to act when the payments were not made timely, no applicable remedy remains.

### C.   *Pre and Post-Petition Disparagements*

The Trustee would also have this Court end this matter quickly and rule that, because Alholm disparaged principals of the Debtor before the execution of the Severance Agreement - and warranted in the Agreement that he had not done so - Alholm was at all times in material breach of the Agreement and not entitled to the benefit thereof.

Paragraph 9 of the Severance Agreement (the Non-Disparagement Clause) provides in relevant part:

> Each party agrees not to make any disparaging statements concerning the other or, in the case of the Company, any of its affiliates or current or former officers, directors, shareholders, employees or agents. Neither party will directly or indirectly take, support, encourage or participate in any action or attempted action . . . which in any way would damage the reputation or business relationships of the other, its agents or representative **and each party warrants and represents that it has not already done so. . .**

(emphasis supplied)

10

There is no doubt that Alholm disparaged the Debtor's principals prior to his execution of the Severance Agreement. Alholm testified that, shortly after his termination, he had conversations that *he* would characterize as disparaging of the Debtor's officers and/or directors with David Gordon,[8] Geoffrey Roper,[9] Lyle Clayton and Chris Boyd.[10] Gordon testified that Alholm had told him that large sums of money were being taken out of the company in an "Enron-like" fashion. Alholm told Gordon that he had been terminated for trying to stop this alleged thievery.

The Trustee's reliance on this pre-Severance Agreement disparagement is, however, misplaced. First, notwithstanding the language in the Severance Agreement by which each party warranted that no disparagement had taken place, the Agreement also provided in its Paragraph 8(b) (the Mutual Release Clause):

> **Millivision**, on behalf of itself and its predecessors, successors, assign [sic], directors . . . and officers . . . voluntarily and irrevocably **release and discharge [Alholm]** . . . **from any and all** charges, complaints, claims, promises, agreements, causes of actions, damages and debts . . . and **liabilities of every name and nature, known or unknown** . . . which, as of the date Millivision signs this Agreement any of them have . . . **including** but not limited to [claims] which relate to your employment with Millivision, **defamation or other torts, and damages or other remedies of any sort,** including, without limitation, compensatory damages, punitive damages, injunctive relief and attorney's fees.

(emphasis supplied). No exception was made in the Mutual Release Clause for obligations

---

[8]Gordon was a former employee of the Debtor who was hired by Alholm and subsequently terminated in 2003. At the time of trial, Gordon was engaged in litigation against another Millivision entity and its officers.

[9]Roper was another employee of the Debtor who would later become one of the petitioning creditors in the involuntary bankruptcy petition filed against the Debtor.

[10]Clayton and Boyd were existing investors and shareholders of the Debtor at the time of the conversation.

11

of Alholm under the Severance Agreement itself.

Accordingly, while one section of the Severance Agreement exacted a warranty from Alholm that he had not disparaged the Debtor, another section of the Agreement excused him from the effect of that action, even if the pre-Severance Agreement disparaging statements were unknown to the Debtor at the time that the Agreement was executed. A conflict of such gravity must be resolved against the interests of the drafter of the document. See Merrimack Valley National Bank v. Baird, 372 Mass. 721, 724 (1977) (citing to Wright v. Commonwealth, 351 Mass. 666, 673 (1967)); Bowser v. Chalifour, 334 Mass. 348, 352 (1956). The primary drafter of the document was the Debtor.

Second, even were the Mutual Release Clause not present, the effect of the Trustee's argument, if upheld, would have Alholm in default of the Severance Agreement as soon as he completed his signature thereon. The Debtor would never have had any obligation to make payments under the Severance Agreement because, at the time of its making, Alholm would already have violated his warranty not to have made disparaging statements before the execution of the Agreement. An agreement under which a party parts with no value is void for failure of consideration. Trustees of Amherst Academy v. Cowls, 23 Mass. 427, 432-33 (1828). Furthermore, an agreement executed by a party intending to declare a default immediately thereafter would undoubtedly be held unconscionable and lacking in good faith. See Zapatha v. Dairy Mart, Inc., 381 Mass. 284 (1980).

And third, even if neither of the foregoing reasons for ignoring the pre-Severance Agreement disparagements were present, the Debtor clearly waived any complaint with respect thereto. Waiver may be demonstrated by either an express and affirmative act, or

12

by conduct which would infer waiver. See, e.g., Kact, Inc. v. Rubin, 62 Mass. App. Ct. 689, 695 (2004). Conduct may sufficiently infer waiver where it is "consistent with and indicative of an intent to relinquish voluntarily a particular right [such] that no other explanation of [the] conduct is possible." Id. (citing to Attorney Gen. v. Industrial Nat'l Bank, 380 Mass. 533, 536 (1980) (quoting Buffum v. Chase Nat'l Bank, 192 F.2d 58, 60-61 (7th Cir. 1951))). An inferred waiver must be based upon "clear, decisive and unequivocal conduct." Kact, Inc. v. Rubin, 62 Mass. App. Ct. at 695 (citing to Glynn v. Gloucester, 9 Mass. App. Ct. 454, 462 (1980)). Whether the Debtor waived the Non-Disparagement Clause with respect to pre-Severance Agreement statements is a question of fact for this Court. See, e.g., Moss v. Old Colony Trust Co., 246 Mass. 139, 151-52 (1923); Suburban Land Co. v. Brown, 237 Mass. 166, 168 (1921).

Testimony and exhibits provided at trial unmistakably demonstrate that the Debtor was aware of the pre-Severance Agreement disparaging statements well before the Severance Agreement was executed. Alholm testified that he was told at the time of his dismissal that one of the reasons for termination was his disparaging statements and his support for disparaging statements made by others in the company. Alholm testified that board members told him he disparaged them by entertaining board of director expense questions from employees at a company meeting. Alholm also entered into evidence an email from an officer which included the statement: "Jeff has been telling various executives and directors stories." And Alholm entered into evidence an email from the Debtor's attorney to Alholm's attorneys which included the statement: "Mr. Alholm must stop contacting employees of Millivision and otherwise interfering in its operations."

Prior to the execution of the Severance Agreement, the Debtor's principals were fully

13

aware of what Alholm had been saying and to whom. Yet, *after* the execution of the Severance Agreement, the Debtor, on at least eight (8) separate occasions,[11] made payments to Alholm of the compensation required under the Agreement. If Alholm's pre-Severance Agreement statements were grounds for declaring a default thereunder, that default was clearly waived.[12]

But pre-Severance Agreement disparagement is not the only breach alleged by the Trustee. He maintains that Alholm disparaged the Debtor's officers and/or directors *after* the execution of the Severance Agreement. The Trustee relies primarily on two events. First, he says that Alholm assisted and encouraged an employee who brought a sexual harassment claim against the Debtor. Second, he says that Alholm was likely the author of the Anonymous Letter. The Trustee has the burden of proof. He failed to sustain that burden.

As to the employee who claimed to have been harassed, the evidence shows that Alholm's actions were only to comfort the employee and suggest that she retain counsel.[13] He did not encourage her to take any action against the company. She was herself well motivated in that respect. And as to the Anonymous Letter - as damaging as it may have proven to the Debtor's fortunes or as embarrassing to some of the individuals mentioned therein - the evidence that Alholm was its author or encouraged its creation or dissemination

---

[11] Payment of the bonus and seven (7) bi-weekly payments.

[12] The Severance Agreement contains no language which suggests that the failure to declare a default on account of a breach of the agreement in one instance shall not be deemed a waiver with respect to other similar or future acts of noncompliance.

[13] The employee ultimately retained the same attorney who was representing Alholm, but there was no evidence that such retention was the idea of anyone other than the employee.

14

was almost non-existent. Alholm undoubtedly agreed with its message. But he was not alone in that. Other employees of the Debtor were of the same mind, and they had far less to lose than Alholm if found to be connected with the document.[14]

D. *The Search for Comparable Employment*

Under Paragraph 2(a) of the Severance Agreement, the Debtor agreed to unconditionally pay Alholm's salary and insurance benefits through June 30, 2003. Thereafter, through December 31, 2003, such payments would be made available only to the extent that Alholm failed to locate comparable employment, commensurate with his experience and educational background. He was required to make a good faith effort to locate such employment and to certify in writing that he made such efforts.

The Trustee argues that Alholm failed to make such good faith efforts. He notes, specifically, Alholm's extensive background and experience and maintains that Alholm would easily have found employment had he been seriously seeking work. Alholm claims to have been looking for comparable employment, interrupted only for a time in which he was required to care for an elderly family member who had taken ill. He listed the names of several companies from whom he had unsuccessfully sought employment.

---

[14] It is appropriate to here note that, well after the close of the evidence, Alholm's estranged wife contacted the Trustee and offered to testify that Alholm had authored the Anonymous Letter. The Trustee asked for an opportunity to present her testimony. But Alholm's wife had no evidence to present except for her recollection of a pre-nuptial discussion between them. Moreover, she was, at the time of her offer of testimony, in the midst of a very contentious divorce proceeding with Alholm. Indeed, her initial contact with the Trustee immediately followed an extremely upsetting event in those proceedings. Under the circumstances, this Court declined to reopen the evidence, measuring benefit against cost and certain that any testimony which might be offered would be tainted by possible bias arising out of her difficult situation.

15

Mitigation is an affirmative defense. The burden of proof lies with the Trustee. The suggestion that Alholm should have been able to find employment is not enough. The Trustee was unable to demonstrate that Alholm failed to make sufficient efforts to find employment or that Alholm rejected any appropriate opportunity that was presented to him.

### E.   *The Return of Property and the Request for Expense Reimbursement*

The Trustee makes more of an impression when he complains that Alholm failed to return substantial personal property of the Debtor. During his employment, Alholm was permitted to reside in an apartment furnished by the Debtor and also to use other personal property which remained property of the Debtor. Under the Severance Agreement, Alholm was required to return that property to the Debtor by January 2, 2003. Not long thereafter, the Debtor demanded the return of the property. Alholm never refused, but rather provided information on where the property could be found or suggestions as to who might have the property. Alholm's responses were insufficient, and certainly not enough to satisfy his obligations under the Severance Agreement. He was required to return the property, not point the Debtor in the right direction. The Debtor valued the property not returned at $15,214.52. There was no contrary evidence of its value.

Furthermore, relying upon a report prepared by Ernst & Young, prepared at the Debtor's request, and submitted into evidence without objection, the Trustee also complained that approximately $148,000.00 of expenses claimed by Alholm during his employ with the Debtor were insufficiently documented. That allegation alone was insufficient to establish a setoff of $148,000.00 against amounts otherwise due Alholm on account of severance payments, medical insurance payments and attorneys' fees. It was,

however, with respect to Alholm's claim for expense reimbursment ($8,431.38), more than enough to shift the burden of persuasion to Alholm as to that portion of his claim. Alholm failed to meet that burden.

F.    *The Final Tally*

Alholm claims that he is owed the amount of $202,288.26 under the Severance Agreement. But nowhere does he provide a breakdown of that amount. Accordingly, the Court will have to piece together the amount of the claim from the facts found above.

Alholm contends that bi-weekly payments under the Severance Agreement were to have been paid until the end of 2003, but he concedes that he located employment in November of that year. Because Alholm did not indicate the precise date of his re-employment, the Court must take the most conservative view and conclude that employment was located as of November 1, 2003. Alholm also concedes that he received seven (7) bi-weekly payments. Accordingly, of the 305 days in 2003 between January 1 and November 1, Alholm was paid for 98 of them. For the remaining 207 days, the Court applies a rate of $547.95 ($200,000.00 divided by 365 days in 2003) for a total of $113,425.65. To this amount, the Court adds $1,363.20 per month of medical and dental insurance premiums ($1,193.20 medical; $170 dental), which Alholm claimed that the Debtor stopped paying as of August of 2003, for a total of $4,089.60 (the three month period of August 1 through October 31). And the Court further adds one-half of the sum of $59,739.08 ($15,371.94 owed to Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.; $5,455.25 owed to Sullivan, Weinstein & McQuay; and $38,911.89 owed to The Law Office of David J. Noonan), or $29,869.54, as Alholm's reasonable attorneys' fees, after assessing

17

reasonableness of the various billings, accounting for likely duplication of services and taking into account Alholm's shared responsibility for the dispute in light of his failure to return the Debtor's personal property. From the subtotal of $147,384.79, the Court deducts the value of the personal property ($15,214.52) which Alholm did not return to the Debtor. The resulting total is $132,170.27.

IV.  CONCLUSION

For all the foregoing reasons, the Objection to Cure Amount is SUSTAINED in part and OVERRULED in part. The Cure Amount is established as $132,170.27. A separate order in conformity with this Memorandum of Decision shall enter herewith. The Trustee shall pay such amount to Alholm within seven (7) days of that order becoming final.[15]

DATED: July 28, 2005                    By the Court,

                                        Henry J. Boroff
                                        United States Bankruptcy Judge

---

[15] To the extent required under federal and/or state law, the Trustee may withhold and pay over such amounts as he may deem appropriate for federal and/or state taxes.